IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

LOUIS PASQUALETTI,                    :
                                      :
        Plaintiff,                    :
                                      :          CIVIL ACTION
v.                                    :          No. 3:13-CV-13 (CAR)
                                      :
UNIFIED GOVERNMENT OF                 :
ATHENS-CLARKE COUNTY,                 :
                                      :
        Defendant.                    :
_____       :

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is disability discrimination and retaliation action under Title I of the
Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, 42
U.S.C. § 12101, *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et
seq.* Plaintiff Louis Pasqualetti, a former Senior Police Officer with Defendant Athens-
Clarke County's Police Department, claims Defendant discriminated against him based
on its perception he suffered from a mental disability and then retaliated against him
when he filed a charge of discrimination with the Equal Employment Opportunity
Commission.  Defendant has now moved for summary judgment. Having considered the
parties' arguments, the record, and applicable law, the Court **GRANTS** Defendant's
Motion [Doc. 34].

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[1]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment.[2]  This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[4]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise

---

[1] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[3] *See id.* at 249-52.

[4] *See id.* at 254-55; *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Celotex*, 477 U.S. at 323 (internal quotation marks omitted).

manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[6] This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

For purposes of this Motion, the material facts in the light most favorable to Plaintiff, the non-movant, are as follows:

Defendant Athens-Clarke County's Police Department hired Plaintiff in 2001, and Plaintiff worked as a uniformed patrol officer until late 2010, when the events giving rise to this action began. On October 29, 2010, Plaintiff fatally shot an assailant to protect the life of another citizen. In the aftermath of the shooting—which was ultimately found to be justified—Plaintiff was transferred to a different unit in the police force, required to undergo three fitness-for-duty exams, placed on administrative leave, forced to choose between a non-sworn government position and resignation, denied the ability to return early from leave, and removed from his position on the police department's Strategic Response Team. Plaintiff contends Defendant unlawfully took these actions based on its perception Plaintiff suffered from a mental disability. Defendant, on the other hand, contends these actions were legitimate business decisions based on Plaintiff's negative attitude, demonstrated hostility toward and inability to get along with his supervisors,

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324-26.
[7] *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

and poor performance.

At the time of the shooting on October 29, 2010, Plaintiff was assigned to the Special Operations Unit, which was also known as the Housing Unit.  As a member of this unit, Plaintiff patrolled three Athens area housing units for street level drug enforcement and other crimes and received 10% of his base salary as supplemental income from the Housing Authority. The shooting occurred while Plaintiff was patrolling one of these housing units on the east side of Athens.

Immediately after the shooting, in accordance with departmental practice, Defendant placed Plaintiff on administrative leave. A week after the shooting, Police Chief Joseph Lumpkin directed the department to conduct an internal review of the shooting separate from the GBI's criminal investigation of Plaintiff's actions. Chief Lumpkin instituted the investigation because the victim of the aggravated assault which led to Plaintiff's use of deadly force did not agree with Plaintiff's explanation of events. The newspaper also reported the victim of the aggravated assault believed Plaintiff's use of deadly force was inappropriate. While on leave, Defendant informed Plaintiff the department's incident review panel would convene and determine whether he had functioned within departmental policy.

<u>Plaintiff's First Fitness for Duty Exam and Reassignment to Property West</u>

Also in accordance with departmental practice, on November 6, 2010, Plaintiff underwent his first Fitness for Duty Exam ("FFDE") with R. Alan Williams, Ph.D, a

licensed clinical psychologist, to assess Plaintiff's current psychological and emotional status and ability to return to duty as a police officer. At this time, Plaintiff informed Dr. Williams that he had good relationships with and support from his fellow officers and superiors in the police department. Dr. Williams acknowledged that although Plaintiff "had been 'counseled' in the past for insubordination," Plaintiff had been a "high performer with the police department" who "has always preferred postings that involve active police work and interdiction."[8] Dr. Williams reported Plaintiff "certainly" presented "no psychotic indices," did "not appear to be suffering from a severe psychiatric disorder," and appeared "to be coping reasonably well with the recent traumatic event involving use of deadly force with a citizen."[9] Dr. Williams recommended "a graduated return to full duty (certainly pending a final investigation and report from the GBI)" and acknowledged Plaintiff was "in the initial phase of adjustment to trauma and is using adaptive coping defenses of minimization and repression as he adjusts to this event (i.e., he may experience more vivid or active symptoms at some time delay.)"[10] Dr. Williams suggested the following steps:

> (a) At the discretion of his superior officers and administration, return to temporary alternative assignment or administrative (i.e., non-patrol) duty position for several weeks, at least until the completion of the investigation[.]
>
> (b) Gradual return to duty would be important . . . . [Plaintiff] should be

---

[8] Fitness for Duty Psychological Evaluation dated 11/6/10, [Doc. 36-6].

[9] *Id.*

[10] *Id.*

strongly   considered   for   assignments   that   are   less   potentially
conflictual/confrontational in nature and are not interdictive in nature[.][11]

Finally, Dr. Williams stated Plaintiff "seems to have acted to be the best of his ability in a

difficult situation, and should be treated with respect and allowed time to emotionally re-

integrate[.]"[12]

Plaintiff returned to the police force on November 17, 2010, and was assigned to

the Property East Investigative Unit, a police unit that investigated crimes on the east

side of Athens. Plaintiff's detective position in this unit was much less conflictive in

terms of interaction with citizens than his former uniform patrol position. Five days later,

on November 22, 2010, Plaintiff took leave because Defendant provided no information

about the investigations into the shooting, and he felt like he was being "kept in the

dark."[13] Moreover, he began to feel as though he was the offender, and the lack of

information made him question whether he would be arrested.[14] Plaintiff remained on

leave for about a month and a half, returning to his position in Property East unit on

January 3, 2011.

On January 15, 2011, Defendant transferred Plaintiff to the Property West

Investigative Unit, despite Plaintiff's expressed desire to remain in Property East. Chief

Lumpkin, however, did not want Plaintiff to be assigned to a conflictive role in uniform

---

[11] *Id.*

[12] *Id.*

[13] Pl. Depo., p. 71 [Doc. 45].

[14] *Id.* at. p. 77.

6

on the east side of Athens.[15] The assignment to Property West would not put Plaintiff in contact with many of the decedent's family members and would not potentially put him in a conflictive role in uniform in the area where the shooting incident occurred.[16] Moreover, Lumpkin believed the supervisors to be better in Property West.[17] Chief Lumpkin intended Plaintiff's assignment to Property West to be for only two to three months.[18]

On February 22, 2011, Chief Lumpkin released the results of the department's internal review into the shooting incident which stated that Plaintiff acted to preserve and protect the life of a citizen.

Plaintiff's Experience in Property West

Plaintiff remained in Property West for five months, until Defendant placed him on administrative leave in June, 2011. Plaintiff expressed his disappointment with the detective assignment, which primarily involved sitting at a desk and working the phones and computer—quite different from Plaintiff's assignment in uniform patrol—from the beginning. In his first interaction with Plaintiff, Plaintiff's second level supervisor, Lieutenant Tyndell, told Plaintiff he "knew this was not [Plaintiff's] choice of assignments," but he thought Plaintiff's experience would be beneficial in executing

---

[15] Lumpkin Depo., p. 155-57 [Doc. 46].

[16] *Id.* at p. 147.

[17] *Id.* at 157.

[18] *Id.* at 162.

search warrants.[19] Plaintiff's front level supervisor, Sergeant Garrett, perceived that Plaintiff did not want to communicate with him.[20] Indeed, Plaintiff acknowledged that he did not want to be around Sergeant Garrett or Lieutenant Tyndell.[21]

Plaintiff points to several negative experiences he suffered while assigned to Property West. According to Plaintiff, his initial assignment to Property West was unnecessary because the unit was fully staffed, and he only had a few cases assigned to him until several months into his assignment.[22] Moreover, Plaintiff states he was treated differently from the other officers in Property West. He was instructed to take someone with him when he was conducting investigations outside the office or meeting with a witness;[23] he was the only officer in the unit not assigned a car, which limited his ability to work his cases;[24] he was told to prioritize his time to close out old cases rather than work on cases where there were "actual leads."[25] Plaintiff also felt he was impeded from effectively performing investigations. On several occasions when Plaintiff rode with co-workers to investigate cases, Sergeant Garrett called the co-worker and told him that Plaintiff needed to come back to the office; when Plaintiff returned, however, there was no apparent reason for his having to return. In fact, on one of these occasions, Garrett

---

[19] Pl. Depo., p. 88.

[20] Garrett Depo., pp. 23-24, 43-44 [Doc. 51].

[21] Pl. Depo., pp. 79-80; 82-83.

[22] *Id.* at pp. 97-98; Pl. Ex. 22, p. 9.

[23] Tyndell Depo., p. 16 [Doc. 50].

[24] Pl. Depo, p. 111.

[25] *Id.* at p. 108.

was not even there when Plaintiff and his co-worker returned.[26] To stay aware of property crimes in his assigned zones, Plaintiff would listen to the police scanner and respond to in-progress calls; Lieutenant Tyndell later issued a directive for all of the detectives not to listen to the police scanner.[27] Plaintiff was one of two trained armorers at the police department, which meant he could repair guns. As a result, maybe two to three times per month, co-workers would bring in guns for him to look at or repair. However, Plaintiff was informed that he could no longer repair the guns or even talk about guns at work. On approximately five or six occasions, Plaintiff had to leave the morning briefings to use the bathroom due to periodic bouts of diarrhea. In March, Sergeant Garrett instructed Plaintiff he was not allowed to leave morning briefings to go to the bathroom.

Plaintiff's supervisors, however, perceived things differently. First, not everyone in the police department had their own assigned vehicle, and it was common for officers in Property West to work in pairs and share a vehicle.  Second, the directive concerning the police scanner concerns all detectives, not just Plaintiff. Third, Plaintiff's supervisors perceived Plaintiff as having a "very negative attitude toward supervision or management'" from the initial assignment and throughout his tenure with the Unit. Moreover, they were concerned he had "instigated dissension within the Unit and ha[d]

---

[26] *Id.* at p. 115.
[27] Garrett Depo., pp. 82-85.

generally 'tainted' the atmosphere that ha[d] prevailed there."[28] Examples of Plaintiff's "'negative attitude' [] include[d] missing morning briefings by repeatedly stating he had to use the bathroom and, thereby, staying out of the meetings or 'walking out'; showing active disinterest in the cases he was assigned; being resistant to partnering with others in the Unit; and seeming to celebrate/glorify aggressive encounters or casualties with citizens in the community."[29] In addition, Plaintiff "had some episodes of noncompliance with requests by his superiors to include disorganization of files and resistance to cooperation on cases involving citizen victims."[30] Plaintiff's superiors "agreed that he would not be hired, given his attitude and behavior, if he were applying initially for the position."[31] Plaintiff had two counseling sessions during his assignment to Property West wherein his supervisors addressed his negative attitude and poor performance.

Meanwhile, in April, 2011, Plaintiff received a very favorable performance evaluation, with a score of 4.5 out of 5 (between "superior" and "exemplary"), covering the previous year, from March 2010 through March 2011. This review was completed by Plaintiff's former supervisor from the Special Operations Unit. Although Plaintiff's current supervisor in Property West signed the evaluation, he disclosed that he did not complete any part of the evaluation because Plaintiff had been assigned to Property West

---

[28] Second Fitness for Duty Exam, p. 2 [Doc. 36-14].

[29] *Id.*

[30] *Id.*

[31] *Id.*

for less than 90 days.[32] Thus, the evaluation did not cover Plaintiff's performance after the shooting.

As time wore on, Plaintiff became increasingly frustrated with his assignment to Property West, feeling forced to remain at the office instead of effectively performing his job duties. In mid-June, 2011, Plaintiff's frustrations came to a head. On June 15, Sergeant Garrett asked to accompany Plaintiff to interview a victim after the morning briefing. Plaintiff agreed, but after waiting for two hours, Plaintiff went to the meeting on his own. When Plaintiff returned, Lieutenant Tyndell called Plaintiff to his office, informing him that Sergeant Garrett was upset.

Around 11:00am on June 15, Plaintiff met with Lieutenant Tyndell and shared his dissatisfaction with his current position. Plaintiff told Tyndell that "every time [Sergeant Garrett] tries to babysit me, every time he wants to hold my hand, it makes me feel like bashing his brains in."[33] Plaintiff said that the position in Property West was just "eating at him," he "was barely above drowning," and he did not feel like he was doing a good job.[34] He told Tyndell, "I fucking hate getting dressed to come to work every day."[35] At this point, Plaintiff believed nothing was going to change in the future to make his problems with the assignment any better.

---

[32] Defendant's Performance Planning & Review Form [Doc. 36-9].

[33] Pl. Depo., p. 142.

[34] *Id.* at pp. 142-43, 148.

[35] *Id.* at p. 143.

Lieutenant Tyndell then met with his supervisor, Major Sizemore, and reported Plaintiff's frustrations and voiced his own concerns about Plaintiff's negative attitude and current hostility. As instructed, Tyndell prepared a memorandum related to Plaintiff's performance since he joined Property West in January 2011. The memorandum specifically mentioned the following: Plaintiff "voiced his disapproval with his new assignment from the beginning"; he was "very reserved in daily communications and continued to voice his displeasure with the assignment"; he "showed little improvement in his attitude and it was evident that he did not like any of investigating cases in his current assignment"; there were "several instances when [Plaintiff] was asked to perform specific tasks by Sgt. Garrett and he was delinquent in doing so"; Plaintiff "continued to show a lack of motivation and made numerous negative comments about the entire operation"; Plaintiff "often made comments during briefings and in general to violent incidents that were being discussed, saying things such as 'a stabbing in Athens, Ga?' or 'awesome' to other events involving reports of shootings or stabbings"; Sergeant Garrett and Lieutenant Tyndell also "notice[d] that a couple of investigator's attitudes were beginning to mirror [Plaintiff's]. But, the last couple of months have noticed that some investigators are now disassociating themselves from [Plaintiff] and they have made vague remarks about his attitude."[36] Tyndell wrote Plaintiff "agreed that his attitude was poor and that he was not good for the Unit, the Investigators or the Department in his

---

[36] Memorandum from Lt. Mike Tyndell [Doc. 36-12].

current state."[37] Moreover, Plaintiff "knew his attitude was 'like a cancer in the unit' and was 'dragging other investigators down.'"[38]

Lieutenant Tyndell and Major Sizemore then met with Chief Lumpkin and Assistant Chief Smith, and a decision was made to place Plaintiff on paid administrative leave, effective immediately, pending a FFDE. Based on Lieutenant Tyndell's memo and his conversations with Plaintiff's supervisors, Chief Lumpkin did not believe the department should allow Plaintiff to remain on active duty without an appropriate FFDE. Around 3:30pm, Lieutenant Tyndell and Major Sizemore met with Plaintiff and informed him of their decision. According to the memorandum, Plaintiff "again stated that he hated his current assignment saying several times 'I have zero desire to be an investigator, it's not what I signed up to do.'"[39] Plaintiff would have "long moments of complete silence, taking deep breaths and exhaling loudly. [Plaintiff] volunteered 'I could give a shit about the dead guy, it's all about the assignment.' He said that twice during the conversation."[40]

Plaintiff's Second Fitness for Duty Evaluation and Defendant's Proposed Transfer

On June 20, 2011, Dr. Williams performed a second FFDE and prepared a report of the evaluation. The report reflects that Plaintiff expressed the following sentiments to Dr.

---

[37] Id.

[38] Id.

[39] Id.

[40] Id.

13

Williams: "repeated dissatisfaction with his placement and his belief that he is being under-utilized by the Department, 'I'm a hunter, I need to be out where the bad guys are'"; "dismiss[al] of the duties and functions of the Unit stating, 'we are out there talking to a bunch of people who don't want our help'"; that Sergeant Garrett was "disgusting," a "coward," and "a message boy"; "resentment of the 'partnering' nature of detective work and [desire] to be more independent"; the desire "to work alone"; and his statements that he "fucking hates to get dressed every day to come to work," I fucking hate what I do," and "some days I feel like smashing somebody's head against a wall."[41] Plaintiff only complained about his current assignment to Property West, and he expressed his "intense desire to rejoin the police uniformed division."[42]

Dr. Williams concluded Plaintiff was not mentally ill or suffering from a severe mood disturbance or delayed symptoms of posttraumatic stress disorder. However, Dr. Williams ultimately found Plaintiff was not fit for duty. After interviewing Plaintiff and Major Sizemore, and speaking with Lieutenant Tyndell on the telephone, Dr. Williams concluded Plaintiff was "resistant and defiant"; "resentful in both passive and active ways"; overt in his "contempt for the Unit [and] the individuals working there"; "determined to return to community police patrol and to be uncooperative unless and until he does"; "rigid, defensive, and single-minded"; little "capacity or willingness to

---

[41] Second Fitness for Duty Exam, p. 3 [Doc. 36-14].

[42] *Id.* at p. 4.

compromise, cooperate, or ability to take the perspective of other people"; "no intention to make personal changes or modifications"; "rigid and inflexible and certain of his position which likely carries over into other interactions"; and showing "negative leadership with his peers and coworkers" which "has engendered a negative work atmosphere in his unit."[43] Finally, Dr. Williams opined that "[b]ased on repeated encounters with [Plaintiff] and reviewing information from various sources, I do not believe he is fit for duty at this time."[44]

After Chief Lumpkin received the second FFDE, he consulted with Human Resources Director Harry Owens and Government Manager Alan Reddish. Based on Dr. Williams' conclusions, Chief Lumpkin believed he could not allow Plaintiff to continue in his sworn law enforcement capacity. However, he wanted to protect Plaintiff's benefits and salary and ensure his chance to accrue the time needed to vest in Defendant's pension program. Thus, Owens looked for a position in the government that would be in Plaintiff's same classification so his pay could remain the same. Owens recommended a position in code enforcement, a non-sworn officer position.

On July 7, Plaintiff met with Chief Lumpkin, Assistant Chief Smith, and Owens, among others, and was informed Dr. Williams found him unfit for duty. They told Plaintiff he could report to work as a Code Enforcement Officer and failure to do so

---

[43] *Id.* at pp. 4-5 (emphasis in original).
[44] *Id.* at p. 5.

would be considered his resignation. Plaintiff believed that accepting a position in code enforcement was not only inappropriate but would also jeopardize his P.O.S.T. certification and potentially subject him to personal danger. Thus, Plaintiff rejected the offer and indicated he would resign. Chief Lumpkin and Assistant Chief Smith, however, urged him to go home, discuss the matter with his wife, and sleep on it before deciding whether to accept the position or resign.

The following morning, Plaintiff called Harry Owens and requested a one year leave of absence. Plaintiff's request was granted.

Plaintiff's Leave of Absence, Independent Fitness for Duty Exam, and Denial of Request for Early Return to Work

Chief Lumpkin prepared a memorandum recommending approval of Plaintiff's requested one-year leave of absence. The memorandum included a "Conditional Return to Work Stipulation: Should employee desire to return to work within 12 months, he must agree to undergo and successfully complete a return to duty psychological examination."[45] Harry Owens approved the recommendation.

On August 1, 2011, only six weeks after Plaintiff underwent his second FFDE with Dr. Williams, Plaintiff underwent an independent FFDE with Dr. Bhushan S. Agharkar, M.D., who, after spending 2.75 hours with Plaintiff and reviewing Plaintiff's personnel

---

[45] Letter from Chief Lumpkin to Plaintiff regarding Request for Leave of Absence [Doc. 37-11].

file and two prior FFDEs, concluded Plaintiff was fit for duty as a police officer.[46] On August 12, 2001, Plaintiff's attorney submitted the independent FFDE and requested Plaintiff be immediately reinstated to his position as a Senior Police Officer.

On August 18, Harry Owens sent Plaintiff's attorney a letter denying the request for reinstatement. The letter states, "[i]t is the intent of the Unified Government of Athens-Clarke County to comply with the terms of the approved Leave of Absence. If [Plaintiff] should desire to return to work at the end of his approved Leave of Absence, his return would be conditional such that he would be required to successfully complete a return to duty psychological examination, and be able to perform the essential functions of the position of Senior Police Officer – if available, with or without reasonable accommodation."[47] Owens rejected Dr. Agharkar's psychological evaluation because Defendant did not choose or approve him.[48]

Chief Lumpkin expressed to Owens that he was willing for Plaintiff to return early from his leave of absence if Plaintiff was cleared by a professional of Defendant's choosing. However, Defendant never informed Plaintiff. On December 1, 2011, Plaintiff filed a charge of discrimination with the EEOC claiming Defendant denied his request for an early return to work despite being cleared by Dr. Agharkar because Defendant perceived he had a disability.

---

[46] Evaluation by Comprehensive Psychiatric Services of Atlanta [Doc. 37-12].
[47] Owens letter to Plaintiff's attorney [ Doc. 37-13].
[48] Owens Depo., pp. 106-07; 112-13 [Doc. 48].

Plaintiff's Fourth Fitness for Duty Exam and Return to Property West

On June 14, 2012, near the end of Plaintiff's requested one-year leave period, Plaintiff underwent a third FFDE with Dr. Williams (his fourth overall), after his counsel made a request. Dr. Williams found Plaintiff suffered from no frank psychopathology and concluded he was fit for duty as a police officer.[49] Dr. Williams, however, "continue[d] to have concerns about [Plaintiff's] ability to work successfully within an organization and to compromise his personal demands in order to accomplish group goals and departmental objectives."[50] He noted Plaintiff's "tendency to be rigid and unwilling to accept personal responsibility or, in fact, supervision from those he deems unworthy of his respect."[51] Moreover, Dr. Williams noted Plaintiff "continue[d] to express significant personal animosity toward his prior supervisors without apparent awareness or willingness to engage them in frank constructive discussion, reconciliation, or compromise."[52] Dr. Williams' final words in the report were "[w]hile [Plaintiff] does not present an anticipated risk to others (i.e., citizens), I suspect he may continue to have difficulty working with superiors and furthering the goals of the department."[53]

Three days after being found fit for duty, Defendant placed Plaintiff in a paid administrative leave capacity to contemplate Plaintiff's return to active duty. Plaintiff

---

[49] Plaintiff's Third FFDE with Dr. Williams [Doc. 37-1].

[50] *Id.* at p. 4.

[51] *Id.*

[52] *Id.*

[53] *Id.* at p. 5.

met with Assistant Chief Brown and Assistant Chief Stephens to discuss their expectations of Plaintiff and teamwork. During the meeting, the assistant chiefs questioned Plaintiff about whether he could function as a member of the department. Plaintiff admitted his prior actions and statements were detrimental to the Property West unit. In response to the stated possibility that he could return to Property West, Plaintiff assured them of his willingness to and ability to handle the position.[54] The assistant chiefs recommended to Chief Lumpkin that Plaintiff be assigned to the Property West Unit.  On August 27, 2012, Plaintiff returned to active duty in the Property West Investigative Unit.

Strategic Response Team

Two years after Plaintiff originally joined the police force, in July 2003, he successfully made Defendant's Strategic Response Team (SRT), known as "SWAT" teams in other departments. Plaintiff served on the SRT until Defendant placed him on administrative leave in June 2011. Even after the shooting incident in August 2010, Plaintiff continued to train and serve with the SRT throughout his assignment to Property West. Indeed, from March 22-24, 2011, Plaintiff participated on an SRT operation that contributed to the capture of a suspect who killed one officer and wounded another. In June 2011, just prior to being placed on administrative leave, Plaintiff participated as team leader of the SRT unit at the Southeastern SWAT team competition where they won for the third consecutive year. Afterward, Chief Lumpkin

---

[54] Stephens Declaration, p. 6 [Doc. 34].

commended Plaintiff for his leadership and thanked him and the team.

When Plaintiff returned to work in late August 2012, after his requested one-year leave of absence, the assistant chiefs concluded Plaintiff should not return to the SRT. The assistant chiefs considered Plaintiff's conduct before the leave of absence, including the comments he made to Lieutenant Tyndell on June 15, 2011, and Dr. Williams' comments on the third FFDE. The assistant chiefs believed Plaintiff needed to focus on his primary job duties and perform well in those capacities before being reconsidered for future assignment to the SRT. On September 28, 2012, Assistant Chief Brown memorialized the decision in a memorandum to Plaintiff.  Brown wrote:

> On August 28th, we also discussed your request to return to your former SRT duties.  I explained that you would not <u>now</u> be assigned to the SRT because of your conduct prior to your leave of absence. . . .
>
> As noted, prior to your leave, your performance was deficient in varied ways and you admittedly had a negative attitude that adversely affected the unit. You also stated that sometimes you wanted to 'beat your [supervisor's] brains out.' These behaviors are inconsistent with those required to be a member of the SRT.
>
> As Assistant Police Chief, I have a responsibility to ensure the safety of SRT team members and the citizens of Athens-Clarke County. As you acknowledged during our discussion, SRT members must be among the best officers in the department. I know from 37 years of police experience that SRT members also must be composed, thoughtful, hard-working and team players. Prior to your leave of absence, you demonstrated behavior that conflicted with these traits.
>
> I explained, however, that the decision about assignment to SRT could be revisited when you display consistently the traits necessary to be a part of that team. In the past, you have demonstrated the ability and willingness to be one of ACCPD's hardest workers. Additionally, we have invested in you as an SRT member many hours of training and practice to hone your SRT skills. I will choose to continue

this investment when your performance and attitude have improved to acceptable levels.[55]

Plaintiff was not re-assigned to the SRT and remained in the Property West position for the duration of his tenure. On March 1, 2014, Plaintiff resigned from the police department.

## DISCUSSION

### I.   DISABILITY DISCRIMINATION CLAIM

Plaintiff claims Defendant's actions violated Title I of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("Rehab Act"). Specifically, Plaintiff alleges Defendant discriminated against him based on Defendant's perception he suffered from a mental disability when Defendant (1) continued Plaintiff's assignment to Property West for months after the shooting; (2) placed Plaintiff on administrative leave in June 2011; (3) required him to submit to a second FFDE with Dr. Williams; (4) forced Plaintiff to choose between the non-sworn Code Enforcement position and resignation; (5) denied his request to return early from his requested one-year leave of absence; (6) delayed Plaintiff's return to work for six weeks after he passed the third FFDE; (7) returned Plaintiff to the Property West position after his return from his one-year leave of absence; and (8) removed Plaintiff from the SRT. Plaintiff's ADA and Rehab Act claims are governed by the same legal standard, and therefore the Court discusses

---

[55] Memorandum to Plaintiff from Assistant Chief Brown [Doc. 45-2].

these claims together.[56]

The ADA prohibits employers from discharging qualified employees based on their disabilities.[57] Plaintiff here seeks to prove these claims through circumstantial evidence,[58] and thus the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[59] guides the Court's analysis.[60]   Under this framework, a plaintiff must first establish a prima facie case by establishing "facts adequate to permit an inference of discrimination."[61]   If the plaintiff establishes his prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[62]   If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[63]   Importantly, the ultimate burden of persuasion remains on the plaintiff

---

[56] Section 504 of the Rehabilitation Act specifically incorporates the ADA's standards in employment discrimination cases: 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be standards applied under title I of the [ADA] and the provisions of sections 501 through 504, and 510 of the [ADA] . . ., as such sections relate to employment."); *see also Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

[57] 42 U.S.C. § 12112(a).

[58] In a footnote to his brief responding to the Motion for Summary Judgment, Plaintiff boldly states that "the facts of this case indicate direct discrimination" without any further discussion or reasoning. Doc. 36, p. 23, n. 18. The Court finds this case is correctly analyzed using the burden-shifting *McDonnell Douglas* framework.

[59] 411 U.S. 792 (1973).

[60] *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

[61] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[62] *Cleveland*, 369 F.3d at 1193.

[63] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

22

all times.[64]

The Court notes that the *McDonnell Douglas* method "was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[65]  Ultimately, a plaintiff will overcome summary judgment if she creates a genuine issue of material fact that permits a "reasonable inference" the employer acted with discriminatory intent.[66]

### 1.   *Prima Facie Case*

To establish a prima facie case for disability discrimination, a plaintiff must specifically demonstrate that (1) he has a disability; (2) he was a "qualified individual" for the position; and (3) he suffered an adverse employment action because of his disability.[67] Defendant contends Plaintiff can prove no element of his *prima facie* case; the Court disagrees.

### a.   "Regarded as" Disabled

A plaintiff can prove he has a disability in three ways: he can show he has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as

---

[64] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[65] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

[66] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[67] *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998); 42 U.S.C. § 12112(a); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005).

having such an impairment."[68] Plaintiff rests his claim on the third definition, that Defendant regarded him as having a mental disability.

"The definition of disability [including under the 'regarded as' definition] shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the chapter."[69] A plaintiff "meets the requirement of 'being regarded as having an impairment' if [he] establishes that he [] has been subject to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.[70] "'In short, to qualify for coverage under the 'regarded as' prong, an individual is not subject to any functional test' and is not required to establish his employer's 'beliefs concerning the severity of the impairment.'"[71] "To defeat summary judgment on this element, Plaintiff is 'only required to raise a genuine issue of material fact about whether [his employer] regarded him as having a mental or physical impairment.'"[72]

The evidence here, viewed in the light most favorable to Plaintiff, creates fact issues as to whether Defendant perceived Plaintiff to suffer from a mental impairment as

---

[68] 42 U.S.C. § 12102(1).

[69] 42 U.S.C. § 12102(4)(a).

[70] 42 U.S.C. § 12102(3)(a).

[71] *Jordan v. City of Union City, Ga.*, ___ F. Supp. 3d ___, Case No. 1:13-CV-2960-AT, 2015 WL 1472185, *7 (N.D. Ga., March 30, 2015) (quoting *Interpretive Guidance on Title I of the Americans with Disability Act*, 29 C.F.R. App. § 1630.2(l)).

[72] *Id.* (quoting *Hilton v. Wright*, 673 F.3d 120, 129 (2nd Cir. 2012)).

a result of his use of deadly force. Prior to the shooting in August 2010, Plaintiff was a highly regarded officer, who performed his job duties well, and received favorable performance evaluations. After the shooting, Defendant placed on him leave and required him to undergo a FFDE out of concern for his mental well-being. Moreover, in the first FFDE Dr. Williams recommended a gradual return to active duty, acknowledging that Plaintiff had undergone "trauma" and "may experience more vivid or active symptoms at some time delay."[73] Thus, Defendant reasonably could have perceived Plaintiff to be undergoing a mental impairment as a result of the shooting.

   b. Qualified Individual

   Defendant also argues because Plaintiff was found not fit for duty, he is not a qualified individual under the statute. A qualified individual is an employee "who, with or without reasonable accommodation, can perform the essential functions of" his job.[74] The ADA's implementing regulations define "essential functions" of a job as "'the fundamental job duties of the employment position the individual with a disability holds or desires,' and 'does not include the marginal functions of the position.'"[75]

   Here, the facts show Plaintiff certainly possessed the skills necessary to perform the fundamental job duties of a police officer. Indeed, he performed those duties at a high level for almost ten years, receiving accolades and positive performance reviews.

---

[73] First Fitness for Duty Psychological Evaluation [Doc. 36-6].
[74] 42 U.S.C. § 12111(8).
[75] D'Angelo, 422 F.3d at 1230 (quoting 29 C.F.R. § 1630.2(n)(1)).

Defendant fails to cite any authority (nor could the Court on its own find any) supporting its argument that finding a plaintiff unfit for duty forecloses his ability to prove he is a "qualified individual" under the ADA or the Rehab Act. Thus, the Court finds Plaintiff has satisfied his burden to at least raise a fact issue as to whether he is a qualified individual under the statutes.

c. Adverse Employment Action

Defendant also contends Plaintiff did not suffer an adverse employment action because of his perceived disability. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employments, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."[76] For purposes of summary judgment, the Court assumes each of Plaintiff's claims is based on a sufficiently adverse employment action to establish a prima facie case of disability discrimination.

**2. Pretext**

As explained more fully below, Defendant has articulated legitimate, nondiscriminatory reasons for all of the employment actions it took against Plaintiff in the aftermath of the shooting. Thus, in order to survive summary judgment, Plaintiff

---

[76] *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (quotation marks omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

must present sufficient evidence to create a genuine issue of material that these reasons are merely pretext for unlawful disability discrimination. "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment."[77] "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions."[78]

To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this _either_ directly by persuading the court that a discriminatory reason more likely motivated the employer _or_ indirectly by showing that the employer's proffered explanation is unworthy of credence."[79]  The inquiry into pretext is concerned with the employer's beliefs, not the employee's perceptions of his performance.[80] Furthermore, this Court does not "sit a super-personnel department that reexamines an entity's business decisions."[81]

Here, Plaintiff fails to create any genuine issue of material fact that Defendant's decisions regarding Plaintiff's employment were merely pretext for disability discrimination. No reasonable juror could find Defendant's reasons for its actions are

---

[77] _Crawford v. City of Fairburn, Ga._, 482 F.3d 1305, 1308 (11th Cir. 2007).

[78] _Mayfield v. Patterson Pump Co._, 101 F.3d 1371, 1376 (11th Cir. 1996) (quotations and citation omitted).

[79] _Jackson v. State of Ala. State Tenure Comm'n_, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).

[80] _Holifield_, 115 F.3d at 1565.

[81] _Alphin v. Sears, Roebuck & Co._, 940 F.2d 1497, 1501 (11th Cir. 1991) (quotation omitted).

unworthy of credence or motivated by any discriminatory animus. Ultimately, the evidence here is simply insufficient to support any inference of intentional discrimination based on Plaintiff's perceived mental disability.

a.  <u>Comparators</u>

Plaintiff attempts to establish pretext as to all of his claims by pointing to Defendant's treatment of all other officers involved in fatal shootings. Plaintiff contends these officers are similarly situated comparators Defendant treated more favorably than Plaintiff, and because Defendant offers no rational explanation for the different treatment, a rational jury could conclude the difference was due to Plaintiff's perceived disability. The Court is unpersuaded by Plaintiff's argument.

The other officers involved in deadly force incidents are not sufficiently similar to Plaintiff to qualify as proper comparators. The adequacy of the comparators is crucial, and the court must consider whether the employees were, in fact, similarly situated to Plaintiff "in all relevant respects" and treated more favorably.[82] First and foremost, the psychologists who evaluated the four other officers involved in fatal shootings did not reach conclusions similar to those reached by Dr. Williams about Plaintiff. Dr. Anthony Stone, Ph.D. evaluated the two officers involved in fatal shootings in 2001, concluded he anticipated no significant job-related problems, and recommended the officers ride with

---

[82] *Holifield*, 115 F.3d at 1562.

a supervisor or senior patrol for at least their first two shifts back at work.[83] Thereafter, the two officers were unconditionally "cleared for unrestricted duty."[84] Likewise, Dr. E. Schmuckler, Ph.D. evaluated the other two officers involved in fatal shootings in 2007, and found both "fit to return to unrestricted law enforcement duty and all of [their] other activities with the Athens-Clarke County Police Department."[85]

Here, although Dr. Williams initially found Plaintiff fit for duty, he recommended a temporary alternative assignment or administrative duty and a consideration for assignments potentially less conflictual and not interdictive in nature. Dr. Williams also acknowledged that Plaintiff was "in the initial phase of adjustment to trauma and is using adaptive coping defenses of minimization and repression" and warned he "may experience more vivid or active symptoms at some time delay."[86] Moreover, as Chief Lumpkin testified, the circumstances surrounding these shootings were very different from the circumstances surrounding Plaintiff's shooting. Thus, Plaintiff cannot rely on Defendant's alleged disparate treatment of other officers involved in fatal shootings to establish pretext.

b.  Continued "Temporary" Assignment to Property West[87]

Plaintiff also argues Defendant discriminated against him by keeping him in

---

[83] Pl. Ex. 4 and 6 [filed under seal at Doc. 53].

[84] *Id.*

[85] Pl. Exs. 10 and 11 [filed under seal at Doc. 53].

[86] First FFDE.

[87] The Court notes that Plaintiff failed to properly exhaust his administrative remedies for this claim under the ADA, and this claim is actionable only under the Rehab Act.

29

Property West beyond the two to three months Chief Lumpkin originally intended. Plaintiff contends the favorable performance evaluation he received for the prior year—March 16, 2010 through March 15, 2011—together with the restrictions placed on his abilities to perform his job duties in Property West—including restrictions on listening to the police scanner, repairing guns, going to the bathroom during morning briefings, having to use his own vehicle, and prioritizing his time to close out old cases—cast doubt on the legitimacy of Defendant's decision. The Court disagrees.

First, the evaluation did not reflect Plaintiff's performance after the shooting. Plaintiff's <u>former</u> supervisor in the Special Operations unit completed the performance evaluation for the period of time Plaintiff worked <u>prior</u> to his use of deadly force. Although Plaintiff's Property West supervisor signed off on the evaluation, he made clear he did not evaluate Plaintiff's performance because Plaintiff had been assigned to the unit for less than 90 days. Second, no reasonable juror could find Defendant implemented the so-called restrictions on Plaintiff's ability to perform his job duties because of any perceived mental disability. The restrictions concerning the police scanner applied to the entire unit, and it was common for officers in Property West to work in pairs and share a vehicle. Moreover, Plaintiff's supervisors perceived Plaintiff as having a negative attitude toward them from the beginning of his placement in Property West. Indeed, they perceived his constant bathroom breaks as further manifestations of his negative attitude and attempts to thwart authority by missing the morning meetings. The

pretext inquiry centers on the employer's beliefs, not the employee's beliefs, and not on the reality that exists outside of the decision maker's head.[88]

c. <u>Placing Plaintiff on Administrative Leave and Requiring him to Undergo Second FFDE</u>

The Court is also unpersuaded by Plaintiff's argument that Defendant's "inherently inconsistent" rationale for placing Plaintiff on paid administrative leave and requiring him to undergo a second FFDE in June 2011 establishes pretext for disability discrimination. The evidence shows Defendant placed Plaintiff on administrative leave and required he undergo a second FFDE based on legitimate business concerns surrounding Plaintiff's ability to perform his duties after Plaintiff's behavior in Property West and comments during his meeting with Lieutenant Tyndell on June 15, 2011. As set forth in Lieutenant Tyndell's memorandum, Plaintiff "showed little improvement in his attitude and it was evident that he did not like investigating cases in his current assignment"; he showed "a lack of motivation and made numerous negative comments about the entire operation"; and he "knew his attitude was 'like a cancer in the unit' and was 'dragging other investigators down.'"[89] Moreover, Plaintiff commented that he "could give a shit about the dead guy"[90]; that violent incidents being discussed such as shootings or stabbings were "awesome"; that "every time [his supervisor Sergeant

---

[88] *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (*citing Holifield,* 115 F.3d at 1565).

[89] Memorandum from Lt. Mike Tyndell [Doc. 36-12].

[90] *Id.*

Garrett] tries to babysit me, every time he wants to hold my hand, it makes me feel like bashing his brains in"; that the position in Property West was just "eating at him"; and that he "fucking hate[d] getting dressed to come to work every day."[91]

Plaintiff argues Defendant presents a "conundrum" by contending it neither perceived Plaintiff as having a mental impairment nor placed Plaintiff on administrative leave for disciplinary reasons. These contentions, however, present no "conundrum" or establish any inconsistencies in Defendant's reasoning for its decision to place Plaintiff on administrative leave pending a FFDE. Defendant's argument it did not perceive Plaintiff as mentally impaired is aimed at whether Plaintiff has a disability under the ADA. Defendant never claims it was not concerned, based on his actions and comments, Plaintiff may be suffering from delayed trauma as a result of his use of deadly force. Indeed, Dr. Williams, in the first FFDE, warned Plaintiff may have delayed trauma. Moreover, Defendant states it wanted Plaintiff to be professionally evaluated because it was "trying to get to the bottom of Plaintiff's issues."[92] In addition, Defendant's decisions to place Plaintiff on administrative leave and have him undergo a FFDE are even more reasonable when considering Plaintiff's performance prior to the shooting was exemplary, but after the shooting, by his own admission, his performance was "barely

---

[91] Pl. Depo, pp. 142-43, 148.
[92] Defendant's Reply Brief, p. 21 [Doc. 52].

above drowning."[93] Ultimately, Plaintiff's arguments are merely his disputes with Defendant's choices; he points to no evidence undermining the legitimacy of Defendant's reasoning to place Plaintiff on administrative leave pending a FFDE in an attempt "to get to the bottom of Plaintiff's issues."[94] While Defendant could have considered "less drastic" measures, as Plaintiff puts it, such a decision is a business one that this Court cannot second guess. Plaintiff may not simply quarrel with the wisdom of the reason proffered "but must meet it head on and rebut it."[95] Plaintiff has failed to do so.

### d.  Choice between Code Enforcement Position and Resignation

The Court is likewise unpersuaded by Plaintiff's argument that Defendant's reasons for forcing Plaintiff to choose between a non-sworn code enforcement position and resignation were pretext for discrimination. As evidence of pretext, Plaintiff points to (1) Dr. Williams's finding in the second FFDE that Plaintiff exhibited no indicia of mental illness; (2) Defendant's failure to question the veracity of the FFDE; (3) Defendant's failure to consider any alternative actions; and (4) Defendant's consideration of forced resignation itself, which it had never previously considered for an employee found to be unfit for duty. This evidence, however, neither establishes that Defendant's reasons for the offer are unworthy of credence nor that Defendant possessed any discriminatory animus.

---

[93] Pl. Depo., p. 142.
[94] Defendant's Reply Brief, p. 21.
[95] *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

33

Defendant's decision was legitimately based on Dr. Williams's conclusion that Plaintiff was unfit for duty as a police officer. Defendant offered him a position in government employment with the same classification of pay and benefits Plaintiff was receiving, and when Plaintiff stated he would resign, Defendant urged him to talk it over with his wife and not to make a hasty decision. Again, Plaintiff simply quarrels with the wisdom of Defendant's decision. No evidence exists Defendant's offer was anything other than legitimate.

e.   <u>Denied Request for Early Return from Leave</u>

Likewise, the record reflects no evidence creating a genuine issue of fact as to the legitimacy of Defendant's reasons for denying Plaintiff's request to return early from his requested leave of absence after Dr. Agharkar found him fit for duty. Plaintiff argues pretext can be established because (1) Defendant violated its own conditional stipulation (as set forth in the memo to Plaintiff) that should Plaintiff wish "to return to work within 12 months, he must agree to undergo and successfully complete a return to duty psychological examination"; and (2) Defendant had no policy stating an exam had to be performed by a professional of Defendant's choosing. However, Defendant's requirement that Plaintiff undergo an examination by a professional of its choosing in no way violates the memo and is a reasonable business decision. Moreover, Defendant is not required to have any policy stating a psychological exam must be performed by a professional of Defendant's choice. Defendant denied Plaintiff's request because Dr.

Agharkar's FFDE was done only six weeks after Dr. Williams had found Plaintiff unfit for duty, by an unknown psychiatrist who spent 2.75 hours with Plaintiff and reviewed Plaintiff's personnel file and two prior FFDEs. No evidence exists showing Defendant had any discriminatory motive in denying Plaintiff's request.

      f.   <u>Delayed Return to Work and Assignment to Property West after Return from Leave</u>

Even assuming Plaintiff's delayed return to work and assignment to Property West after his return from the requested one-year leave of absence qualify as adverse employment actions, no reasonable juror could find Defendant's reasons for these actions were illegitimate or motivated by discriminatory intent. Three days after Plaintiff underwent his third FFDE with Dr. Williams and was found fit for duty, Defendant placed Plaintiff on paid administrative leave while it contemplated his return to work. Although Dr. Williams found Plaintiff fit for duty, he continued to express concerns, including Plaintiff's continued hostility to supervision. Defendant made a reasonable business decision to talk to Plaintiff before simply reinstating him. Indeed, before his return, the assistant chiefs met with Plaintiff and discussed his past behaviors and whether he would be a functional part of the police force, specifically including the possibility of returning to Property West. Plaintiff assured the assistant chiefs he could function, even with Property West. Although it may seem a better business decision to assign Plaintiff to another department given his past experiences in Property West, such

decision was Defendant's to make, and this Court cannot second guess it. "No matter how medieval a firm's practices, no matter how high handed its decisional process, no matter how mistaken the firm's managers," the courts do not interfere and reexamine an entity's business decisions.[96]

g.  Removal from SRT

Finally, Plaintiff also fails to establish Plaintiff's "removal" from SRT was anything other than a legitimate business decision. During the meeting prior to Plaintiff's return to work after his leave of absence, the assistant chiefs discussed Plaintiff's prior conduct and statements and decided not to allow his return to SRT so Plaintiff could focus on his primary job duties.  As Assistant Chief Brown explained to Plaintiff, his behavior prior to his leave of absence, including his negative attitude that adversely affected the unit, and his comments that he sometimes wanted to "beat [his supervisor's] brains out," were "inconsistent with those required to be a member of the SRT."[97] The assistant chiefs were concerned about the safety of the SRT team members and the citizens of Athens-Clarke County. Moreover, Defendant required SRT members to "be among the best officers in the department"—"composed, thoughtful, hard-working and team players."[98] Defendant believed Plaintiff's behavior prior to his leave of absence "conflicted with these traits."[99]

---

[96] *Elrod v. Sears, Roebuck & co.*, 939 F.2d 1466 (11th Cir. 1991) (quotation marks and citation omitted).
[97] Assistant Chief Brown's Memo to Plaintiff [Doc. 45-2].
[98] *Id.*
[99] *Id.*

36

As evidence of pretext, Plaintiff points to his continued success in SRT up to his leave of absence, even receiving a thank you letter from Chief Lumpkin for his leadership in the SRT in June 2011, just prior to Defendant placing him on administrative leave. However, Plaintiff's prior success in SRT does not counter Defendant's legitimate business decision not to reassign him based on its belief Plaintiff's actions while in Property West were not those exhibited by an SRT member. Based on the record evidence here, the Court cannot second guess Defendant's legitimate business decision.

## II.   RETALIATION CLAIMS

The ADA's general anti-retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter[.]"[100] The Court assesses Plaintiff's ADA retaliation claim under the same framework used for Title VII retaliation claims.[101] To establish a prima facie case of disability retaliation, a plaintiff must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression.[102] Moreover, the plaintiff must show the "protected activity was a but-for

---

[100] 42 U.S.C. § 12203(a); *Albra v. Advan, Inc.*, 490 F.3d 830 (11th Cir. 2007).

[101] *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).

[102] *Id.*

cause of the alleged adverse action by the employer."[103] Once a prima facie case of retaliation is established, the burden then shifts to the employer to present legitimate, non-discriminatory reasons for its actions.[104] If the employer offers legitimate reasons for its action, the plaintiff must then demonstrate that the proffered explanation is a pretext for retaliation.[105] Ultimately, Plaintiff must show that Defendant's reasons for the adverse actions were pretext for retaliation and retaliation was the but-for cause of the adverse action.[106]

Plaintiff asserts Defendant delayed his return to work after his one-year leave of absence, reassigned him to Property West, and removed him from SRT in retaliation for filing the December 1, 2011 EEOC complaint. Defendant contends Plaintiff cannot satisfy a sufficient causal connection between Plaintiff's EEOC complaint and the alleged adverse employment actions. Plaintiff contends temporal proximity sufficiently establishes a causal connection.

To satisfy the requisite causal connection through temporal proximity, the proximity between protected expression and adverse action must be "very close."[107] Here, Plaintiff recognizes that on its face, the six-month gap between Plaintiff's complaint

---

[103] *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ___, ___, 133 S.Ct. 2517, 2534 (2013); *see E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (applying but-for causation standard for Title VII retaliation claim under *Nassar* to ADA retaliation claim); *Feist v. La. Dep't of Justice,* 730 F.3d 450, 454 (5th Cir. 2013) (same).

[104] *Stewart,* 117 F.3d at 1287.

[105] *Id.*

[106] *Nassar,* 133 S.Ct. 2517.

[107] *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

(filed on December 1, 2011) and Defendant's first adverse action (delayed return to work after Dr. Williams found Plaintiff fit for duty on June 14, 2012) does not meet the "very close" threshold.[108] However, Plaintiff argues because Defendant's first opportunity to retaliate was in June 2012, the causation threshold is satisfied. The Eleventh Circuit, albeit in unpublished opinions, has held causation may be established through evidence demonstrating the adverse employment action was Defendant's "first opportunity to retaliate."[109] For purposes of this Motion, the Court will assume Plaintiff establishes a causal connection through this "first opportunity to retaliate" theory.

Even assuming Plaintiff satisfies causation here, no reasonable jury could find Defendant's reasons for its actions were pretext for retaliation. Plaintiff cannot point to a genuine issue of material fact that "legitimate reasons were not what actually motivated [Defendant's] conduct."[110] As thoroughly discussed above, Defendant's actions were based on legitimate business reasons after thoughtful consideration. Moreover, Plaintiff only offers temporal proximity to establish pretext. The Eleventh Circuit has found summary judgment proper where the defendant offers legitimate reasons, and the

---

[108] The Eleventh Circuit has held that a three-month gap is simply too long, without more, to establish causation: *Id*. at 1364; *see also Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("By itself, the three-month period . . . does not allow a reasonable inference of a causal relation between the protected expression and the adverse action.").

[109] *See Jones v. Suburban, Inc.*, 577 Fed. Appx. 951, 953 (11th Cir. 2014).

[110] *Combs*, 106 F.3d at 1538.

employee only offers temporal proximity.[111]

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 34] is

**GRANTED**.

**SO ORDERED**, this 29th day of September, 2015.

S/  C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

---

[111] *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (affirming summary judgment for employer where plaintiff only offered temporal proximity as evidence of pretext for defendant's legitimate reasons for termination).